ORIGINAL

Approved: _____
THANE REHN/DANIELLE R. SASSOON
Assistant United States Attorneys

Before: HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

17 MAG 7428

- - - - - - - - - - - - - - - - - - X
                                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :   Violations of 18
        - v. -                      :   U.S.C. §§ 371,
                                    :   1956(a), and 2
DAVID STASIOR,                      :
                                    :   COUNTY OF OFFENSE:
                    Defendant.      :   NEW YORK
                                    :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

Christopher Swenson, being duly sworn, deposes and says that he is a Special Agent with the Department of State, Diplomatic Security Service, and charges as follows:

## COUNT ONE
### (Money Laundering)

1.   From at least in or about 2013 through at least in or about 2016, in the Southern District of New York and elsewhere, DAVID STASIOR, the defendant, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, harboring individuals for purposes of commercial sex acts, traveling in interstate and in foreign commerce, and using and causing to be used mails and interstate facilities, in violation of Title 18, United States Code, Section 1952, with the intent to promote the carrying on of such specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.)

## COUNT TWO
## (Travel Act Conspiracy)

2.      Between at least in or about 2013 and at least in or about 2016, in the Southern District of New York and elsewhere, DAVID STASIOR, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

3.      It was a part and object of the conspiracy that DAVID STASIOR, the defendant, and others known and unknown, willfully and knowingly, would and did travel in interstate commerce, and use the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit, prostitution and money laundering, and thereafter would and did perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

### Overt Acts

4.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts were committed in the Southern District of New York and elsewhere:

a.      Between at least 2013 and 2016, a co-conspirator not named as a defendant herein ("CC-1") owned and operated Fantasia, a brothel located in Manhattan, New York.

b.      On or about February 13, 2013, CC-1 sent an email to an account belonging to the owner and operator of a website that displays advertisements for brothels, which attached photographs of a woman posing in a sexually explicit manner, along with instructions regarding posting these photographs in online advertisements.

    c. In or about January 2013, DAVID STASIOR, the defendant, sent CC-1 an excel file containing a financial spreadsheet documenting the revenue and expenses of CC-1's unlawful prostitution business.

  (Title 18, United States Code, Section 371.)

  The bases for my knowledge and the foregoing charge are, in part, as follows:

    5. I am a Special Agent with the U.S. Department of State, Diplomatic Security Service ("DSS"). This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Background On The Korean Brothel Industry In The New York Metro Area

    6. Based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of documents obtained during the investigation, I have learned, among other things, that:

    a. The immigration laws of the United States allow citizens of certain countries, including South Korea, to travel to the United States without a visa. To do so, citizens of these countries can apply for a visa waiver through an electronic system called the "ESTA" system. To qualify for such a waiver, the applicant must affirm that he or she is visiting the United States for tourism purposes, and that the applicant will not work while in the United States.

    b. Individuals, commonly referred to as "brokers," offer immigration services to, among others, young women living in and around South Korea. In particular, these brokers claim that they can arrange for young women to travel to the United States via the aforementioned visa waiver program, or by helping them to fraudulently obtain various kinds of non-immigrant visas. In some cases, these brokers exploit the ESTA

3

system, instructing the women about how to file fraudulent visa waiver forms.  Other times, the brokers arrange for the women to travel first to Mexico or Canada, and then to cross into the United States illegally.  United States-based brothel "owners" have also been known to provide the same sorts of services, either in concert with "brokers," or by independently communicating with Korean women themselves.

          c.    Some of the women travel to the United States fully intending to work illegally as prostituted women upon their arrival.  These females are also obliged to turn over a certain percentage of their earnings to the owners, in order to cover their room and board expenses, as well as the cost of advertising their services.

          d.    Several of the businesses operate in and around the New York City area.  These businesses typically operate brothels, which, at times, pose as legitimate businesses, such as spas.  Often, these businesses maintain lists of customers who have been vetted or vouched for by other brothels or customers, and will generally cater only to those customers.

          e.    Often these businesses specialize in a particular type of prostitution, which is referred to as the "Girlfriend Experience," or "GFE."  GFE brothels offer clients specific types of sex acts, including kissing women who are being prostituted, and not using a condom for certain sexual activity, which is often priced at double the rate of normal prostitution services.  Advertisements for such brothels typically contain certain hallmarks, such as the acronym GFE placed adjacent to the photo of a given prostituted women, often in lingerie or nude.  The acronym GFE will often be paired with the word "new" or "first time in USA."

          f.    These businesses, including GFE brothels, will often operate websites, which are used to, among other things, advertise specific women who are working at the business's brothel.  These women typically use stage names or pseudonyms.  Generally, clients can request appointments with specific women, and can ask either to meet with the woman at one of the business's brothels (often called "in-calls"), or at a location of the client's choosing (often referred to as "out-calls").  Clients typically pay for prostitution either by the hour or by the half-hour.  It is not uncommon for prostituted women to work at multiple brothels, or to transition from a brothel or business that is closing to another brothel or business.  Furthermore, the prostituted women will sometimes

4

rotate among certain brothels with an established relationship between (or with common) proprietors, in order to offer "new girls" periodically, which attracts repeat clients who will often e-mail the brothel specifically to ask if any new or different girls are available.

### Overview of Stasior's Offense Conduct

7. As set forth in detail below, DAVID STASIOR, the defendant, assisted CC-1,[1] who owned and operated a brothel called "Fantasia," which was, until at least April 2016, located at or about 162 Henry Street, in Manhattan, New York, and which advertised through the website www.nycfantasia.com (the "Fantasia Website"). STASIOR assisted with CC-1's business, including by providing financing and financial advice about how to manage the brothel's expenses, which included revenue spent on advertising services for the Brothel. The defendant and CC-1 engaged in money laundering, through which they used the proceeds of harboring individuals for the purpose of commercial sex acts to promote those activities.

### The Brothels

8. Since in or about 2012, DSS, Department of Homeland Security - Homeland Security Investigations, the Internal Revenue Service Criminal Investigations Division, and the United States Postal Inspection Service have been investigating brothels that operate, among other places, in and around South Korea, New York, and New Jersey. As described in more detail below, based on my participation in the investigation, my conversations with other law enforcement agents and others, and my review of documents and reports, I have learned that law enforcement agents have identified a group of Korean brothels (the "Brothels") in the New York metro area that are independently owned but advertise through common sources and assist each other, including by sharing customer lists, and employing some of the same women.

9. As part of the investigation, law enforcement has been working with a confidential source ("CS-1").[2] CS-1 has informed law enforcement, in substance and in part, that:

---

[1] CC-1 has been separately charged in this District with money laundering conspiracy and Travel Act conspiracy, and has pleaded guilty to money laundering conspiracy.
[2] CS-1 was an employee of some of the Brothels, and was approached by law enforcement in connection with this

5

   a. Beginning in or about 2009, CS-1 began working in brothels.

   b. In or about 2014, CS-1 began to work at Fantasia. CC-1 was the owner of Fantasia when CS-1 worked there. CS-1 subsequently left Fantasia, and began to work at other brothels.

   c. CS-1 worked at these brothels as a manager. CS-1's responsibilities included, among other things, making appointments for customers, collecting money owed to the business, and making payments to advertisers. Typically, the prostituted women would keep a portion of the money paid by the customer, and the rest would be turned over to the owner of the brothels.

   d. CS-1 identified Fantasia as being among a group of brothels that were independently owned, but assisted each other (that is, the Brothels). For example, CS-1 explained that the Brothels shared a customer list, employed overlapping groups of women, and exchanged information regarding law enforcement.

   e. CS-1 explained that the Brothels maintained and shared a large list of customers who were "approved" to visit the Brothels (the "Customer List"). When a brothel received an incoming call from a potential customer, the telephone number was checked against the list. The list was divided into multiple categories, including, among other things, "approved" customers and suspected law enforcement. In addition, the list contained notes about the customers.

  10. On or about April 13, 2016, law enforcement agents executed search warrants at several Brothels, including Fantasia. Several employees and affiliates of the Brothels were arrested, and evidence was seized pursuant to the warrants, including computers from which copies of the Customer List were recovered.

---

investigation. CS-1 is cooperating with the investigation, in the hope of receiving leniency. To date, information provided by CS-1 has proven reliable, and has sometimes been corroborated by independent evidence.

### Online Advertising For The Brothels

11. Based on my review of records, Internet websites, and the returns from orders for email header information issued pursuant to Title 18, United States Code, Section 2703(d), I have learned, among other things, the following:

   a. The Brothels advertised online through websites (the "Brothel Websites"), including the Fantasia Website.

   b. During the period covered by this Complaint, commercial sex trafficking businesses routinely advertised their services through an online content aggregator (the "Advertising Website"). These businesses typically created an account with the Advertising Website, through which they could upload and modify their advertisements. Advertisements for Fantasia have appeared on the Advertising Website.

12. Based on my participation in this investigation, and as specified below, I have learned that owners of the Brothels paid other individuals to help with online advertising for the Brothels on the Brothel Websites, and the Advertising Website, and used email to communicate with co-conspirators about advertising for the Brothels and management of the Brothels.

### The Fantasia Brothel

13. Based on my participation in the investigation and my conversations with other law enforcement agents and others, I have learned that in or about July 2015, law enforcement obtained a search warrant for a Google email account (the "CC-1 Email Account"). Based on my review of the emails in the CC-1 Email Account,[3] I have learned the following:

   a. The CC-1 Email Account appears to be linked to CC-1 because, among other things, (i) the account is registered in the name of CC-1, and (ii) the account contains a number of emails identifying the residential address of the user

---

[3] The emails described in this paragraph include emails written in Korean that have been translated as part of the investigation. These draft translations, and any descriptions of the contents of the email herein, are preliminary and subject to change based on further investigation.

7

of the CC-1 Email Account, which was the same as CC-1's residential address during the relevant period.

      b.   The CC-1 Email Account sent and received numerous emails related to the management of and advertising for Fantasia, including, but not limited to the following:

      i.   On or about July 30, 2013, the CC-1 Email Account sent an email to an email account that is listed as the contact email address for several Brothel Websites on the Advertising Website, which attached a photograph of the Fantasia logo.

      ii.   On or about February 13, 2013, the CC-1 Email Account sent an email to an account, which based on my participation in this investigation, I understand to belong to the owner and operator of a website that displays advertisement for brothels, which attached photographs of a woman posing in a sexually explicit manner, along with instructions regarding posting these photographs in online advertisements. Based on my training and experience, my conversations with other law enforcement agents and others, and my familiarity with the investigation, I believe that these photographs are consistent with the types of photographs that are used to advertise for the Brothels.

      iii.   A number of emails in the CC-1 Email Account attach photographs of documents titled "New Customer Lists." These documents match the description of the Customer List provided by CS-1, see supra ¶ 9(e), and are in the same format as versions of the Customer List recovered by law enforcement agents from computers found in searches of multiple Brothels, see supra ¶ 10.

      iv.   Multiple emails in the CC-1 Email Account attach detailed accounting spreadsheets that document Fantasia's financial operations, including emails with "David SS," which are discussed in more detail infra ¶ 19.

### The Defendant's Involvement with Fantasia

14. In addition to the information provided by CS-1 to law enforcement described supra ¶¶ 9(a)-(e), I have participated in a meeting during which CS-1 informed law enforcement, in substance and in part, that CS-1 had worked as the manager of the Fantasia brothel when it was owned by CC-1. CC-1 gave CS-1 instructions and information about the operations of the Fantasia brothel. Among other things, CC-1 told CS-1

about a man named "David," who had initially been a customer of CC-1's while CC-1 was employed as a prostitute at one of the Brothels, and who subsequently developed a relationship with CC-1. CC-1 told CS-1 that "David" had given CC-1 a sum of money to assist her in opening the Fantasia brothel, and that CC-1 made periodic payments to "David" in return.

15. As described *supra* ¶ 10, as part of this investigation, law enforcement agents executed search warrants at several Brothels, including Fantasia, and obtained multiple versions of the Customer List stored on devices kept in the Brothels. As part of my investigation, I have learned that one telephone number included on a version of the Customer List (including a version of the Customer List seized from Fantasia) matches the telephone number provided on a passport application filed by DAVID STASIOR, the defendant, in or about June 2012.

16. As part of my investigation, I have conducted an interview of an individual ("Individual-1") who informed me of the following, in substance and in part:

    a. Individual-1 previously worked for CC-1 as a prostitute at Fantasia until the law enforcement raid in April 2016, *see supra* ¶ 10.

    b. Individual-1 identified a photograph of DAVID STASIOR, the defendant, as "David," whom Individual-1 knew as CC-1's boyfriend. Individual-1 provided a phone number for "David," which is the same number found on the Customer List and provided on STASIOR's passport application, *see supra* ¶ 15.

    c. Individual-1 identified a check written to Individual-1 from STASIOR on or about August 18, 2015 in the amount of $7,200. Individual-1 explained that CC-1 had given Individual-1 the check, and asked Individual-1 to deposit the check and then provide CC-1 with the funds because CC-1 could not complete the transaction in CC-1's own name.

17. As part of this investigation I have reviewed bank records from a bank account held by CC-1, and learned that CC-1 received two checks signed by "David Stasior" and from the checkbook of DAVID STASIOR, the defendant, with STASIOR's home address on the check: one check was dated August 18, 2015 in the amount of $7,400, and the second check was dated January 5, 2016, in the amount of $3,200.

18. Based on my review of emails in the CC-1 Email Account, I have learned that between at least December 2012 and

9

May 2015, CC-1 exchanged approximately seventy emails with a person named "David SS" who used the email account yourgoodfriend2012@gmail.com (the "David SS Email Account"). Based on my participation in this investigation, it appears that DAVID STASIOR, the defendant, is the user of the David SS Email Account for the reasons described *infra* ¶ 21.

       19.   In the emails between CC-1 and DAVID STASIOR, the defendant, CC-1 and STASIOR appear to discuss the operation of the Fantasia brothel business, including but not limited to the following:

       a.   On or about January 4, 2015, STASIOR emailed CC-1 about CC-1's "Mid-town opportunity," and appears to discuss the merits of moving CC-1's brothel business to a new location. STASIOR provided CC-1 the following advice:

> What does a "good" business mean? Profitable and busy, ideally where the owner does not work and does not have their own private customers (who will likely follow that worker/owner elsewhere). You need an adequate lease. Ideally the landlord would be really good person. You would like business where owner does not owe other people money or have some complicated ownership story. You would like place that has never been raided, I think.
>
> What does a "good" location mean? I am not completely sure. I think not near schools or day-cares or other area that attracts children. Ideally other tenants in the building are fine with the business and its entrance and its advertising and signage. Hopefully public transportation is nearby. ... I was thinking of using [the Advertising Website] and review sites to try to learn addresses and then place dots on a map to see just where places are located.

Based on my training and experience, and my participation in this investigation (including the knowledge that CC-1 was operating the Fantasia brothel), I believe that STASIOR is referring to ideal conditions for opening an unlawful brothel business (including finding a place "that has never been raided," that is "not near schools" or "children," and whose other tenants will not raise objections to the business). In addition, in that same email, STASIOR appears to discuss a debt that CC-1 owes him. The email states, "At the same time, you pay me back just little bit each month, say $1000, and save the rest of the money. ... I would, of course, like to be paid back as soon as possible!"

b.  In several emails, CC-1 and STASIOR attach and discuss drafts of excel spreadsheets that appear to contain the financials of CC-1's business. For example:

i.  On or about January 14, 2013, STASIOR sent CC-1 an email with the subject line, "Excel File Thru December." The email stated: "I added a template for January data, listing the days as rows and entering some calculations in specific cells. You can of course change anything and use or not use this. See what you think." The email included an attached excel document entitled "13-01-14 Henry Math.xlsx," which appears to be a financial spreadsheet documenting the revenue and expenses of Fantasia (located on "Henry" Street), including the expenses for "Ads," "Rent," and the "Manager," and the revenue and profit from "Customer." The spreadsheet also includes a row entitled "Partner," who the initials "SH" and "DS" underneath. "SH" are CC-1's initials, and "DS" are the STASIOR's initials. In addition, the spreadsheet includes a row entitled "Actual Paid DS," which based on my experience with this investigation, I believe to be referring to repayment of loans to "David SS." *See, e.g., supra* ¶ 14 (CS-1 stated that "David" had loaned CC-1 money that CC-1 periodically repaid); ¶ 17 (STASIOR wrote checks to CC-1); ¶ 19(a) (STASIOR asked to be repaid "just little bit each month").

ii.  On or about March 3, 2013, STASIOR replied to an email sent by CC-1 in February 2013, which had transmitted the "January excell [sic] sheet." In the reply, STASIOR attached an excel document titled "13-03-02 Henry Math" and stated: "Honey, here is the Excel file that has actual data through January. I added spaces for you to enter the February data. Please let me know if anything seems screwy."

iii.  On or about March 5, 2013, STASIOR sent CC-1 an email with the subject line, "Brief Thoughts." In the email, STASIOR stated, in part:

> [CC-1], When I review the numbers for the business, I am impressed that the business has consistently made money. As I have said before, that is quite an accomplishment. I am also struck that the relationship between advertising and customer number is unclear. If you had good data on when you advertise and how often customers on the phone ask for someone in the advertisement, you could mathematically assess the value of advertising. Without collecting the data, you will never know whether advertising is really helpful or not. The only person making real money is the manager. If you were in that role, you would be making real money. I do not know

11

>           what your co-owner things [sic] of you taking on this role,
>           but I think it might make good sense to try it for a week and
>           assess whether you can do the job or not.  I am betting you
>           can.

Based on my training and experience with this investigation, STASIOR appears to be advising CC-1 to study the effectiveness of spending money on advertising for Fantasia, including by gathering more data on whether Fantasia customers call and ask to make appointments with women who appeared in the advertisements ("how often customers on the phone ask *for someone in the advertisement*"), *see supra* ¶ 6(f) (describing how brothel clients can request appointments with specific women). STASIOR also appears to be urging CC-1 to take on the additional role of manager within the business in order to personally make more money.

     iv. On or about March 5, 2013, STASIOR sent CC-1 an email with the subject line "Summary Page." In that email, among other things, STASIOR stated: "I sent you a summary page that lists the totals for the four months ... The number of customers and revenue is remarkably stable. ... Most expenses remain unchanged from month to month. Ads are the primary one that changed. They climbed significantly in February from $1,650 to $4,380."

     v. On or about May 2, 2013, CC-1 sent STASIOR an email with the subject line "april sheet." The email included an attached excel document entitled "13-03-02 Henry Math.xlsx." Like the spreadsheets sent in January and March, *see supra* ¶¶ 19(b)(i)-(ii), the "april sheet" appears to be a financial spreadsheet documenting the revenue and expenses of Fantasia, and includes a row entitled "Actual Paid DS." On or about May 2, 2013, STASIOR replied to CC-1, identifying several errors in the spreadsheet and asking CC-1 to "make the fixes, and resend the spreadsheet."

     vi. On or about December 27, 2013, STASIOR sent CC-1 an email with an attached excel document entitled "13-12-12 Henry Street Math v16.xlsx." In the email, STASIOR stated the following, in part: "I have attached an updated spreadsheet that attempts to describe your financial situation clearly—with the goal of helping you, of course." Among other things, the email describes the difference between income and debt, and states: "However, when I loaned you extra money in October, that was not income. No, that was increasing your loan amount to me. We did this, of course, so you could pay off a different loan that had high interest." The email also describes several

graphics contained in the excel worksheet, including a graph that "shows the revenue and profits and the proportion of them that was generated by the weekly fee you charge the girls." Based on my training and experience with this investigation, the "girls" appears to be a reference to the prostitutes that CC-1 employed at Fantasia and the "weekly fee" appears to be a reference to the portion of the employees' prostitution profits that they paid to CC-1, see supra ¶¶ 6(c), 9(c). In the email, STASIOR also refers to graphics that "show the number of customers by type, such as hourly or half hour." Based on my training and experience with this investigation, this appears to be a reference to brothel customers, who pay for prostitution by the hour or the half-hour increment, see supra ¶ 6(f).

        vii.    On or about May 13, 2015, STASIOR sent CC-1 an email with the subject line "New Business," and an attached seven-page word document entitled "2015-05-13 New Business Thoughts.docx." Based on the sender and the content, the document appears to be advice written by STASIOR to CC-1, "with the simple hope that these ideas prove helpful." Among other things, the document states:

> [Y]ou still have debt here with me. Repaying that debt is not simple. ... At the moment, if you paid me back $6,000 each month, you could almost pay back the principal by the end of the year. But right now, Henry Street may not have that much profit. So it looks like it would be very difficult to pay me back in 2015. That means the debt continues into 2016.

Based on my training and experience with this investigation, it appears that STASIOR is communicating an expectation that CC-1 repay a debt to STASIOR using profits from the Fantasia business, located on Henry Street. It also appears that STASIOR lent CC-1 over $48,000 for her business, if paying STASIOR back at a rate of $6,000 a month, starting in May, would "almost pay back the principal" on the debt "by the end of the year."

        20.    Based on my review of records obtained from Google, Inc., I have learned that the David SS Email Account was created on or about May 5, 2012, and deactivated on or about April 23, 2016, which was within ten days of the law enforcement raid conducted at Fantasia and other Brothels, see supra ¶ 10. Based on my experience and training, the deactivation of the email account shortly after the arrests is an indication that the accountholder, DAVID STASIOR, the defendant, see infra ¶ 21, was attempting to avoid detection by law enforcement.

21. Based on my participation in this investigation, it appears that DAVID STASIOR, the defendant, is the user of the David SS Email Account for the following reasons, among others:

    a. The user of the Subject Account refers to himself as "David," and is stored in the CC-1 Email Account as "David SS."

    b. The metadata for several of the spreadsheets sent between CC-1 and the David SS Email Account indicate that the files were both authored by and last modified by "David Stasior" or "dstasior."

    c. The CC-1 Email Account contained email notifications from the social networking website LinkedIn that referenced the activity of "David Stasior." The CC-1 Email Account also contained several photographs of CC-1 with a man who appeared to be the same person depicted in the LinkedIn profile photograph of "David Stasior," and the same person depicted in the photograph accompanying STASIOR's passport application, *see supra* ¶ 15.

    d. The user of the David SS Email Account refers to a debt owed by CC-1, *see, e.g., supra* ¶ 19(vii), which is consistent with bank records that show checks written from DAVID STASIOR to CC-1 in 2015 and 2016, *see supra* ¶ 17.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of DAVID STASIOR, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

*Christopher Swenson*
Special Agent
U.S. Department of State
Diplomatic Security Service

Sworn to before me this
5th day of October, 2017

_____
HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York